Commonwealth *v.* Vogel, Appellant.

2

4

Argued November 14, 1969. Before BELL, C. J., JONES, COHEN, EAGEN, O'BRIEN, ROBERTS and POMEROY, JJ.

*Robert D. O'Connor,* for appellant.

*Allan W. Lugg,* for appellee.

ORDER PER CURIAM, July 13, 1970:

Judgments of sentence reversed and new trial granted.

---

OPINION BY MR. JUSTICE JONES IN SUPPORT OF THE ORDER PER CURIAM:

On August 1, 1962, Dennis Vogel shot and killed two persons during the course of an armed robbery. Immediately thereafter, Vogel returned to his home, packed his car and, with his wife and infant child, drove to Canada for a previously planned vacation. On August 2, 1962, Vogel was arrested by Canadian officials in response to a radio communication from the Pennsylvania police. The police officers searched the trunk of Vogel's car and found the fruits of the robbery—cash, money bags and green stamps.

At his trial, in the Court of Common Pleas of Clinton County, in February of 1968, Vogel pleaded not guilty by reason of insanity, producing in support of his insanity claim evidence of his discharge from the Air Force because of mental illness and the testimony of various lay and expert witnesses. No useful purpose would be served by a repetition of all of this voluminous testimony; it is sufficient that it be noted that, from his early teens, Vogel displayed erratic and often bizarre conduct. Illustrative thereof is the testimony of Vogel's former wife that she interrupted a war game Vogel was playing, with M & M candies representing soldiers, "He liked the green ones, I don't know why, but he had the greens on one side and the orange on the other side, and he would make all of the other colors move like troops to help the other side. Q. You mean like reserves or something like that? A. Yes, and so just for the fun I reached down and I grabbed an M & M and I popped it in my mouth and he got furi-

ous at me because it wasn't dead yet. Q. The M & M wasn't dead yet? A. Yes, the M & M wasn't dead yet. It was not a soldier that was killed, in other words."

The defense offered the testimony of three eminently well-qualified psychiatrists to establish Vogel's legal insanity. Once again, the testimony being quite lengthy, I will not repeat it but merely quote the doctors' conclusions. Dr. Leslie R. Angus, the Assistant Superintendent of the Danville State Hospital, testified as follows: "A. My opinion is that he was unquestionably, legally insane at the time he was alleged to have committed this crime on August 1, 1962. Q. You say that without the slightest hesitation? A. Without the slightest hesitation." Dr. Bernard J. Willets, the Assistant Superintendent and Clinical Director of Farview State Hospital, treated the defendant for five and one-half years between the time of his arrest in 1962 to the time of his trial in 1968.[1] The doctor summarized his testimony as follows: "In my opinion, Dennis Vogel was legally insane at that time [August 1, 1962]." Dr. Robert Sadoff, a privately-practicing psychiatrist from Philadelphia, who was also the Clinical Director of the Forensic and Diagnostic Hospital at Holmesburg Prison, testified as follows: "My opinion, based on the facts, and based on my examination of him, [is] that he was legally insane, at the time, on August 1, 1962."

The Commonwealth offered no direct evidence which either rebutted or impeached any of the testimony as to Vogel's insanity. Rather, the prosecution relied upon the presumption of sanity and the testimony of various witnesses as to the circumstances surrounding the robbery and killings. Such testimony was summarized

---

[1] Vogel had been declared incompetent to stand trial immediately after his arrest and was, therefore, committed to Farview under Dr. Willets' care.

by the court below, in its opinion, as follows: "Defendant's prior threats to kill the deceased Atwood [the manager of the store]; his debts and financial problems; the day before the killing he was seen across the street looking over the Grant store; the acts took place after 12 o'clock noon after the store was closed; after the killings ransacking the safe, taking over $800 in cash and taking Mrs. Rechel's pocketbook, and other items from the store; throwing away a .22 calibre revolver purchased by him sometime before the killings; within an hour after the crime fleeing with his wife and child to Canada; warning his wife not to look into the trunk where he had placed most of the stolen items; as the police were coming into the restaurant in Canada where he and his wife had gone to eat, attempting to pass a large roll of bills to his wife and when she refused to take it, to place it in her blouse."

The jury found Vogel guilty of armed robbery and on two counts of murder in the second degree, in spite of an adequate and comprehensive charge on the doctrine of felony murder. He was sentenced to serve ten to twenty years in prison for the armed robbery and for the first count of murder. He was further sentenced to life imprisonment on the second count of murder, the trial judge relying on the Act of June 24, 1939, as amended, December 1, 1959, P. L. 1621, §1, 18 P.S. §4701. The trial court dismissed Vogel's motion for a new trial, and he now appeals from the judgments of sentence.

I will first deal with Vogel's claim that Section 701 of The Penal Code, referred to above, is not applicable to a defendant charged with having committed multiple murders at or about the same time. Section 701 provides: "Whoever is convicted of the crime of murder of the second degree is guilty of a felony, and shall, for the first offense, be sentenced to undergo imprisonment by separate or solitary confinement not exceed-

ing twenty (20) years, or fined not exceeding ten thousand dollars, or both, and *for the second offense,* shall undergo imprisonment for the period of his natural life." (Emphasis added)

As employed in this statute, the term "second offense" means a *subsequent* murder, a murder which was committed after a conviction for a prior murder, and which was not part of the same transaction or occurrence which led to the first murder. *Cf. Commonwealth v. Swingle,* 403 Pa. 293, 169 A. 2d 871, *cert. denied,* 368 U.S. 862 (1961). In order to increase the punishment for a second offense of second-degree murder, a prior conviction for murder must precede the commission of the second murder. The sentence of life imprisonment which was imposed by the trial court, on the second count of murder, was incorrect.

Appellant's second contention is that the trial court charged improperly on the burden of proving sanity.[2] Specifically, it is urged that the prosecution should have had the burden of proving sanity beyond a reasonable doubt, as a fact necessary to constitute the crime of murder.

Three views presently exist as to the *quantum* of evidence which is required to rebut the presumption of sanity in a criminal case. Annot., 17 A.L.R. 3d 146 (1968).

In the federal courts, the sanity of the defendant must be proven by the prosecution beyond a reasonable doubt, once the issue has been properly raised.[3]

---

[2] The test for legal insanity in Pennsylvania is the "M'Naghten Rule." *Commonwealth v. Woodhouse,* 401 Pa. 242, 164 A. 2d 98 (1960).

[3] Only "some" evidence is required to raise the issue of insanity in the federal courts. *E.g., United States v. Currens,* 290 F. 2d 751 (3d Cir. 1961). However, in at least seven states, the issue is not raised (*i.e.,* the presumption of sanity is not overcome) until the defendant's evidence is sufficient to raise a reasonable doubt as to his sanity. Annot., 17 A.L.R. 3d 146, 175 (1968).

*Lynch v. Overholser,* 369 U.S. 705, 82 S. Ct. 1063 (1962) ; *Davis v. United States,* 160 U.S. 469, 16 S. Ct. 353 (1895). The issue of sanity is treated as an element of the crime which the prosecution must prove once the question of sanity is contested. Apparently, this is also the position of twenty-two of the states. Annot., 17 A.L.R. 3d 146, 158-59 (1968). If viewed as an element of the crime, it might be argued that due process would *require* the prosecution to prove sanity beyond a reasonable doubt. *In re Winship,* 397 U.S. 358, 90 S. Ct. 1068 (1970). But see *Powell v. Texas,* 392 U.S. 514, 545, 88 S. Ct. 2145, 2160 (1968) (concurring opinion).

At the opposite end of the spectrum was the Oregon statute, which required a defendant to prove his insanity beyond a reasonable doubt. *Ore. Comp. Laws,* §26-929 (1940).[4] This statute was held to be constitutional in the face of an attack upon it as being violative of a defendant's right to due process of the laws. *Leland v. Oregon,* 343 U.S. 790, 72 S. Ct. 1002 (1952). In view of the apparent basis for the federal rule, *i.e.,* that sanity is an element of the crime to be proven beyond a reasonable doubt, it is interesting to note that the majority in *Leland* specifically rejected that concept. *Id.* at 794, 72 S. Ct. at 1005.[5]

The third rule, applied in this Commonwealth and at least twenty-three other states,[6] places the burden upon the defendant to prove his insanity "by a fair

---

[4] The Oregon legislature has since replaced this statute with one which requires a defendant to prove his insanity by the preponderance of the evidence. *Ore. Rev. Stat.* §136.390 (1967). The Oregon courts have declined to require the prosecution to prove a defendant's sanity beyond a reasonable doubt. *State v. Haggblom,* 249 Ore. 676, 439 P. 2d 1019 (1968).

[5] The entire thrust of the dissenting opinion in *Leland* was that sanity is an element of the crime.

[6] Annot., 17 A.L.R. 3d 146, 195 (1968).

preponderance of the evidence." *Commonwealth v. Carluccetti,* 369 Pa. 190, 199, 85 A. 2d 391, 395 (1952). Inherent in this rule is the rationale that sanity is *not* an element of the crime but, rather, involves the ability to understand and comprehend the right and the wrong of the commission of the crime, a state of mentality which would render punishment by way of confinement in a penal institution futile and would require institutional confinement of the defendant for treatment rather than for punishment. *Cf.* Act of October 20, 1966, Spec. Sess. No. 3, P. L. 96, art. IV, §413, 50 P.S. §4413. In my view, insanity is a defense upon the proof of which an accused may avoid punishment for the crime committed. As was pointed out in the case of *Durham v. United States,* 214 F. 2d 862, 876 (D.C. Cir. 1954), "[o]ur collective conscience does not allow punishment where it cannot impose blame."

In a jurisdiction which uses the "irresistible impulse" test to determine legal insanity, as redefined in *Durham, id.* at 874-75, the question of insanity, at the least, is closely connected with the question of whether the killing was intentional.[7] It may be appropriate, in such a jurisdiction, that the burden of proof as to both should be the same, since they are both concerned with what is clearly an element of the crime —*i.e.,* the intent to kill. In Pennsylvania, a person may be legally insane *either* if he is incapable of knowing what he was doing, *or* if he does know what he was doing but was incapable of judging that it was wrong to do so. *Commonwealth v. Woodhouse,* 401 Pa. 242, 164 A. 2d 98 (1960).

As indicated by the facts in the instant case, legal insanity in this Commonwealth may or may not bear on the question of intent. The prosecution presented

---

[7] The *Durham* rule was explained in the case of *Washington v. United States,* 390 F. 2d 444 (D.C. Cir. 1967).

ample evidence that Vogel planned his crime, from which evidence intention might be inferred, but no evidence that Vogel could appreciate the character of his actions. An individual may intentionally kill someone, with malice aforethought, but be incapable of distinguishing right from wrong in so doing. Under such circumstances, the elements of murder would be met (*Commonwealth v. Kirkland*, 413 Pa. 48, 195 A. 2d 338 (1963)), but the individual's legal insanity would properly necessitate a verdict of not guilty by reason of insanity. This is the type of situation which is demonstrated on the face of the instant record.

Appellant herein urges that this Court should overrule long-standing case law in Pennsylvania, and adopt the federal rule which would require the prosecution to prove sanity beyond a reasonable doubt, as an element of the crime. I cannot accept the premise that sanity is necessarily an *element* of every crime. To the contrary, I view insanity as being the basis upon which society offers treatment rather than punishment to one who has committed a crime. *See* H. Rome, *M'Naghten, Durham and Psychiatry*, 34 F.R.D. 93 (1964). Although every element of a crime can be established beyond a reasonable doubt, including the element of intent to do the act, insanity may still be asserted as a defense in Pennsylvania. Because of our abhorrence of punishing a man who could not evaluate his actions, if a defendant can demonstrate, by a fair preponderance of the evidence, that he was *legally insane* when he committed the crime for which he has been charged, he should be found not guilty by reason of insanity. *See Commonwealth v. Updegrove*, 413 Pa. 599, 198 A. 2d 534 (1964).

We specifically decline to adopt the federal rule as to the burden of proving sanity or insanity. The burden remains on the defendant to prove his insanity by a fair preponderance of the evidence.

The final point made by the appellant presents a most important issue which I believe to be of first impression in this Court: may one be convicted of murder, even though the Commonwealth, relying on the legal presumption of sanity, presents no direct evidence to contradict or impeach the testimony of witnesses, lay and expert, who unequivocally testify that, at the time of the homicide, the accused was legally insane within the definition of legal insanity under the M'Naghten rule?

The trial court answered this question in the affirmative, relying upon prior decisions of this Court wherein, I suggest, a genuine conflict existed between the *evidence* presented by the Commonwealth and that of the defendant. *E.g., Commonwealth v. Updegrove,* 413 Pa. 599, 198 A. 2d 534 (1964); *Commonwealth v. Carluccetti,* 369 Pa. 190, 85 A. 2d 391 (1952). In the case at bar, the Commonwealth offered *no affirmative direct evidence* bearing on the question of the defendant's sanity, *i.e.,* the ability to distinguish between right and wrong at the time of the killings. The maximum that might be established by the testimony of the Commonwealth's lay witnesses is that the actions of the defendant were apparently intentional. Such testimony did not serve to rebut the defendant's proof of legal insanity, but merely established the circumstances of the crime, and the events leading to the apprehension of the defendant. Accordingly, the verdicts are not supported by the evidence and must be set aside. *Commonwealth v. Hazlett,* 429 Pa. 476, 240 A. 2d 555 (1968); *Commonwealth v. Radford,* 428 Pa. 279, 236 A. 2d 802 (1968); *Commonwealth v. Tabb,* 417 Pa. 13, 207 A. 2d 884 (1965). *Cf.* Act of June 15, 1951, P. L. 585, §1, 19 P.S. §871.

The defendant's expert and lay witnesses clearly, unequivocally and without contradiction testified to

Vogel's legal insanity before, during and after he committed this crime. The Commonwealth offered no evidence to rebut this testimony, but relied upon certain circumstantial evidence (introduced during its case in chief), from which it might be *inferred* that Vogel intended to commit the crime. However, *the fact that an individual intends to commit an act does not necessarily indicate that he has the ability to determine whether it was right or wrong to do that act.*

In this Commonwealth, we have refused to participate in the war of psychiatrists which some authorities fear. *See* K. Menninger, *The Crime of Punishment* (1966). Thus, the mere fact that the Commonwealth has offered no expert witnesses to rebut those of the defense does not itself preclude a jury from finding the defendant to have been sane, *provided* that there is *some* evidence to substantiate the conclusion that he was legally sane—*i.e.*, that he could differentiate between right and wrong. *Commonwealth v. Updegrove,* 413 Pa. 599, 198 A. 2d 534 (1964); *Commonwealth v. Carroll,* 412 Pa. 525, 194 A. 2d 911 (1963); *Commonwealth v. Lance,* 381 Pa. 293, 113 A. 2d 290 (1955); *Commonwealth v. Carluccetti,* 369 Pa. 190, 85 A. 2d 391 (1952). If the rule did not include this proviso, then, as in the case at bar, a jury might return a verdict totally without evidentiary support of record.

The Commonwealth argues that the verdict is supported by the presumption of sanity, and that the jury may choose to disbelieve any witness. A verdict must be based upon evidence, and a presumption is not evidence. A verdict may not be based solely upon a presumption where there is evidence which credibly contradicts the presumption. *Allison v. Snelling & Snelling, Inc.,* 425 Pa. 519, 229 A. 2d 861 (1967). *See Commonwealth v. Wucherer,* 351 Pa. 305, 41 A. 2d 574 (1945). The function of a presumption is to reach a

14

presumed conclusion of fact, in the *absence* of credible evidence to the contrary. *Waugh v. Commonwealth*, 394 Pa. 166, 146 A. 2d 297 (1958). When sufficient or adequate evidence is presented to prove legal insanity, the presumption of sanity disappears as a rule of law, and a verdict may not be based thereon. IX *Wigmore on Evidence* §2491 (3d ed. 1940).[8]

In the case at bar, the defendant produced evidence of legal insanity, sufficient and adequate in every respect, which was neither rebutted nor contradicted nor impugned, while the Commonwealth utterly failed to produce *any* evidence of legal sanity. Under such circumstances, the legal *presumption* of sanity is not sufficient to permit, in the face of the *uncontradicted* evidence of insanity, a finding of guilt. The instant record being devoid of *any* evidence which might support the verdict, such verdict cannot stand.

The judgments of sentence are vacated, and a new trial is granted.

Mr. Justice O'BRIEN joins in this supporting opinion.

---

OPINION BY MR. JUSTICE ROBERTS IN SUPPORT OF THE ORDER PER CURIAM:

While I agree that appellant is entitled to a new trial, I cannot agree with the refusal to place the burden on the Commonwealth of proving appellant's sanity beyond a reasonable doubt. One of the most fundamental principles in our criminal law is that it is for the State to prove, beyond a reasonable doubt, all the elements of a crime. Equally fundamental is the principle that murder is not, in Mr. Justice FRANKFURTER's

---

8 "Presumptions may be looked on as the bats of the law, flitting in the twilight but disappearing in the sunshine of actual facts." *Mockowik v. Kansas City, St. J. & C. B. R.R.*, 196 Mo. 550, 571, 94 S.W. 256, 262 (1906).

words, merely "a muscular contraction resulting in a homicide." *Leland v. Oregon,* 343 U.S. 790, 802, 803, 72 S. Ct. 1002, 1009 (1952) (dissenting opinion).[1] For a defendant to be guilty of murder, the "muscular contraction" must be coupled with a mens rea—"malice aforethought express or implied." *Commonwealth v. Drum,* 58 Pa. 9, 15 (1868). This mens rea is as much an element of the crime of murder as is the physical act of killing.

If mens rea, or intent, is an element of the crime of murder, the capacity to form that intent, i.e., legal sanity, must likewise be an element of the crime. Clearly "it is necessary, in order to prove the intent, to show that the perpetrator was capable of forming the requisite intent." *Bradford v. State,* 234 Md. 505, 512, 200 A. 2d 150, 154 (1964). I therefore cannot agree with the assertion that "[a]n individual may *intentionally* kill someone, with malice aforethought," even though he is legally insane, i.e., legally incapable of forming the intention. Legal sanity is an essential element of the crime of murder and must be an issue for the Commonwealth to prove beyond a reasonable doubt. See *In re Winship,* 397 U.S. 358, 90 S. Ct. 1068 (1970).

---

[1] In *Leland v. Oregon,* supra, the United States Supreme Court held that Oregon could constitutionally require a defendant to prove his insanity beyond a reasonable doubt. The continuing validity of *Leland,* however, has been called into serious question by the recent decision in *In re Winship,* 397 U.S. 358, 90 S. Ct. 1068 (1970), which decided for the first time that the reasonable doubt standard was part of Due Process and applicable to the states. There the Court, relying in part on Mr. Justice FRANKFURTER's dissent in *Leland,* as well as *Davis v. United States,* 160 U.S. 469, 16 S. Ct. 353 (1895) (discussed infra), held: "Lest there remain any doubt about the constitutional stature of the reasonable-doubt standard, we explicitly hold that the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of *every fact necessary* to constitute the crime with which he is charged." (Emphasis added.)

Thus I believe that the trial court was in error in the instant case when it charged the jury that the burden was on the defendant to prove by a preponderance of the evidence that he was *not* sane. This charge, in effect, required the defendant to disprove an element of the crime of murder and I do not believe this to be proper.

I would adopt the rule which is now in effect in at least twenty-two of the States and in the federal courts. See cases cited in 17 A.L.R. 3d 158-59. These jurisdictions, taking for granted that most men are sane, do not initially require the prosecution to prove sanity, for it will be presumed. But if the defendant introduces evidence indicating that he is not sane, the presumption can no longer be relied upon by the State and the prosecution must prove sanity, as it must all other elements of the crime, beyond a reasonable doubt.[2]

Under the charge used in the instant case the jury could very well have had a reasonable doubt as to a defendant's sanity, and hence his guilt, and yet have convicted him because they were charged that the defendant must prove he was *not* sane. Compare *Brock v. United States*, 387 F. 2d 254 (5th Cir. 1967) (granting new trial where the government produced only a single lay witness to rebut government psychiatrist's testimony that defendant was not legally sane). I do not think we can or should permit such a verdict to stand. As Mr. Justice HARLAN, speaking for the United States Supreme Court over seventy years ago, stated: "How, then, upon principle, or consistently with humanity, can a verdict of guilty be properly returned,

---

[2] Section 413 of the Mental Health and Mental Retardation Act of 1966, 50 P.S. §4413, would still be applicable under this rule. That section provides that whenever a defendant is acquitted on the ground of insanity, the jury shall state such reason in its verdict and the court may then direct the Attorney for the Commonwealth to initiate civil commitment proceedings.

if the jury entertain a reasonable doubt as to the existence of a fact which is essential to guilt, namely, the capacity in law of the accused to commit that crime?" *Davis v. United States,* 160 U.S. 469, 488, 16 S. Ct. 353, 358 (1895).

I therefore concur only in the grant of a new trial.

———

OPINION BY MR. JUSTICE POMEROY IN SUPPORT OF THE ORDER PER CURIAM:

I concur in the order granting a new trial, but deem it appropriate to make certain further observations as to the effect of the presumption of sanity and the burdens of proof and production in a case such as this.

According to the view this Court has expressed on past occasions, a presumption of law is not evidence nor should it be weighed by the factfinder as though it had evidentiary value. Rather, a presumption is a rule of law enabling the party in whose favor it operates to take his case to the jury without presenting evidence of the fact presumed. It serves as a challenge for proof and indicates the party from whom such proof must be forthcoming. When the opponent of the presumption has met the burden of production thus imposed, however, the office of the presumption has been performed; the presumption is of no further effect and drops from the case. See *Watkins v. Prudential Insurance Co.,* 315 Pa. 497, 173 Atl. 644 (1934); *Szmahl's Estate,* 335 Pa. 89, 6 A. 2d 267 (1939); *Geho's Estate,* 340 Pa. 412, 17 A. 2d 342 (1941); *Commonwealth v. Wucherer,* 351 Pa. 305, 41 A. 2d 574 (1945); *Waters v. New Amsterdam Cas. Co.,* 393 Pa. 247, 144 A. 2d 354 (1958); *Waugh v. Commonwealth,* 394 Pa. 166, 146 A. 2d 297 (1958); and *Allison v. Snelling & Snelling, Inc.,* 425 Pa. 519, 229 A. 2d 861 (1967). See, also, 9 Wigmore, 3rd Ed. §2490 et seq. (1959).

The soundness of this understanding is supported by a consideration of the various grounds for recognition

of particular presumptions: the probability that the presumed fact is in the nature of things likely to be true; the procedural convenience of presuming, without proof, a fact frequently not put in issue; the fairness of allocating the burden of production to the party having superior access to the means of proof; and considerations of policy which lead the courts to favor one contention over another by giving it the benefit of a presumption. McCormick, *Evidence*, §309 (1954). The presumption of sanity reflects a common sense view that a man is more likely than not to be sane; speaking as it does to the generality of cases, the presumption is entitled to no evidentiary or probative weight when it is rebutted in a particular case. Quite simply, I understand the presumption of sanity to be a product of procedural convenience, eliminating the issue of sanity from the trial of the case unless and until some attempt is made by the defendant to raise the issue and rebut the presumption.

A further issue arises from the need to define the quantity of evidence which the opponent of a presumption must introduce in order to satisfy the burden of production thus placed upon him. In cases like that now before us, some courts have found that the defendant's burden is met by the production of "some" or "any" evidence; others have held that the burden of production is met only by evidence which is fairly preponderant or by evidence adequate to sustain a juror's reasonable doubt as to the fact presumed.[1] In my view, it is most appropriate to require the defendant, if he would rebut the presumption, to produce competent evidence sufficient to create a reasonable doubt in the mind of the jury. Competent evidence may ultimately be found incredible by a jury, but credibility is of

[1] See generally, A. Goldstein, *The Insanity Defense*, chap. 8, and cases cited at ftnt. 9 (1967).

course a fact issue which arises only after a case has been properly submitted to the jury. In the present case it is clear that the defendant's evidence, consisting as it did of the unequivocal testimony of four well-qualified psychiatrists, was adequate to rebut the presumption of sanity regardless of the standard employed. Having produced competent testimony adequate to create a reasonable doubt as to his sanity, the defendant in my view met his burden of production, and the presumption of sanity, having been rebutted, disappeared from the case.[2]

A further, basic question remains as to the burden of persuasion on the issue of sanity. I realize that our case law has placed upon the defendant the burden of establishing his insanity by a preponderance of the evidence. This rule was accepted without question by the appellant in the case at bar, and the trial judge correctly so charged. Upon reflection, however, I see no reason why the Commonwealth should not have the same burden with regard to sanity, once that matter has been put in issue, as we have placed upon it as to all other facts necessary to support a guilty verdict. As has been noted by one leading authority, ". . . as to all these claims for exoneration [affirmative defenses such as insanity] their truth goes in final analysis to the guilt,—to the rightness of punishing the accused. Thus it seems inconsistent to demand as to some elements of guilt, such as an act of killing, that the jury be convinced beyond a reasonable doubt, and as to others, such as duress or capacity to know right from wrong, the jury may convict though they have such doubt. Ac-

---

[2] The learned trial judge, in his thorough charge, gave a correct statement of the sanity presumption. It was not overemphasized, being mentioned at only one point in a 5-page discussion of the subject of sanity. But the judge did not (and under our existing law he properly could not) charge the jury that the presumption had served its purpose and was to be disregarded.

cordingly, the recent trend both in English and Amercan decisions is to treat these so-called matters of defense as situations wherein the accused will usually have the first burden of producing evidence in order that the issue be raised and submitted to the jury, but at the close of the evidence the jury must be told that if they have a reasonable doubt of the fact on which the justification is based they must acquit." McCormick, *Evidence*, at p. 684 (1954).

A similar conclusion is reflected in the American Law Institute's Model Penal Code, §§1.12 and 4.03 (Prop. Official Draft, 1962). Section 1.12(1) provides that each element of an offense is to be proved beyond a reasonable doubt, the innocence of the defendant being assumed absent such proof. Section 1.12(2) provides that an affirmative defense such as insanity need not be disproved "unless and until there is evidence supporting such defense." Thus the Code places the burden of production upon the defendant, but that burden having been met, the burden of persuasion lies with the prosecution.[3]

The burden which this approach would place upon the Commonwealth may be met by any competent evidence, including circumstantial evidence. But in the present case the Commonwealth produced no direct affirmative evidence to prove that the defendant was legally sane at the time of the murder; neither was

---

[3] It should be noted that Tentative Draft No. 4 of the Code contained an alternative provision requiring a defendant to prove his insanity by a preponderance of evidence. That provision was rejected by vote of the Institute in May, 1955. As to the quantum of evidence necessary to satisfy defendant's burden of production, the comments to the Code provide that "It should suffice to put the prosecution to its proof beyond a reasonable doubt that the defendant shows enough to justify such doubt upon the issue [to which the presumption speaks]." Model Penal Code, §1.13, comment 3 at p. 110 (Tent. Draft No. 4, 1955).

there any circumstantial evidence which tended to prove legal sanity, as distinguished from intent or design to carry out the robbery in the course of which the homicide occurred.

To summarize, I believe that the presumption of sanity relieves the Commonwealth of the necessity of establishing the defendant's sanity, unless and until the defendant introduces evidence sufficient to create a reasonable doubt as to the existence of sanity. Such evidence having been here presented, the burden of persuasion that the defendant was sane was in my view properly with the Commonwealth. On the face of the record before us, the Commonwealth did not meet that burden. The jury's verdict being thus not supported, the defendant was entitled to a new trial.

---

DISSENTING OPINION BY MR. CHIEF JUSTICE BELL:

Because the issues involved in this case are so important, it will be necessary to analyze and review at length our prior decisions and the basic reasons for the principles laid down therein.

In the first place, we note that it is the well-settled and long-established law that a person can be convicted of murder on circumstantial evidence alone—no eyewitness is necessary and no direct proof of the actual murder is required for conviction: *Commonwealth v. Slavik*, 437 Pa. 354, 358, 261 A. 2d 583; *Commonwealth v. Simpson*, 436 Pa. 459, 463, 260 A. 2d 751; *Commonwealth v. Thomas*, 429 Pa. 227, 231-232, 239 A. 2d 354; *Commonwealth v. Finnie*, 415 Pa. 166, 171, 202 A. 2d 85; *Commonwealth v. Carroll*, 412 Pa. 525, 194 A. 2d 911; *Commonwealth v. Hart*, 403 Pa. 652, 170 A. 2d 850; *Commonwealth v. Boden*, 399 Pa. 298, 159 A. 2d 894; *Commonwealth v. Bolish*, 381 Pa. 500, 113 A. 2d 464; *Commonwealth ex rel. Garrison v. Burke*, 378 Pa. 344, 106 A. 2d 587; *Commonwealth v. Libonati*, 346 Pa.

504, 31 A. 2d 95; *Commonwealth v. Karmendi,* 328 Pa. 321, 195 Atl. 62; *Commonwealth v. Ewing,* 439 Pa. 88, 264 A. 2d 661 (1970).

These well-settled principles of law have been overlooked or ignored by the Majority, *and these principles apply to and control this case.* This is the Majority's first major error.

If (as we have seen) a conviction of murder can be legally sustained on circumstantial evidence alone—provided such evidence is sufficient to establish guilt of the crime charged beyond a reasonable doubt—it should be crystal clear and unquestionably obvious that sanity, which is the normal state of man, can legally be found and sustained by similar circumstantial evidence. Indeed, the present case is an even stronger case for the application of these principles of circumstantial evidence, because it is aided and supplemented by the presumption of sanity, which is so strong, so well established and so necessary for the protection and safety of Society that it cannot be ignored or swept under the rug or changed by Judicial ukase. This is especially so because insanity is an affirmative defense which *must be proved by the accused* by a fair preponderance of the evidence. It is, we repeat, clear as crystal that if a man can be convicted of murder on circumstantial evidence without direct testimony (if and when that evidence is sufficient to prove defendant's guilt beyond a reasonable doubt), *a fortiori a man's sanity can be established by circumstantial evidence without direct testimony or proof thereof.*

The second major error of the Majority is that they have completely forgotten that this Court has countless times iterated and reiterated that *the credibility of a witness is for the jury and not for the Court. Commonwealth v. Wilson,* 431 Pa. 21, 27, 244 A. 2d 734; *Commonwealth v. Chermansky,* 430 Pa. 170, 242 A. 2d 237;

*Commonwealth v. Chambers,* 367 Pa. 159, 79 A. 2d 201; and cases, infra.

With these principles in mind, we shall now review the relevant facts, as well as additional authorities, which are particularly applicable.

Dennis Vogel, while committing a robbery, shot and killed *two persons.* A jury found him guilty of armed robbery and *on two counts of murder* in the second degree. The Court sentenced Vogel (1) to imprisonment for a term of not less than ten nor more than twenty years (a) *on one count of murder* and (b) on another count of armed robbery, these prison terms to run consecutively; and (2) to life imprisonment on the second count of murder. Defendant's motion for a new trial was dismissed by the lower Court. From the judgments of sentence, defendant took this appeal.

The Commonwealth proved that the defendant, a former employee of the Grant Store in Lock Haven, Clinton County, entered that store while it was closed for the luncheon hour, and *shot and fatally wounded Atwood, the manager, and Mrs. Rechel,* his secretary, who were the only persons in the store. Defendant then stole from the safe several money bags containing approximately $800, and the secretary's pocketbook, and various items of merchandise from the store. Immediately thereafter, defendant returned to his home, where his wife and infant child were awaiting his arrival. The family then drove to Canada for a previously planned vacation. Defendant was arrested by Canadian officials in response to a radio communication from the Pennsylvania police. A search of defendant's automobile disclosed a suitcase in the trunk of the car which contained the stolen money bags, and a box of cartridges in the glove compartment which were of the same caliber as those used in the murders. After his arrest by the Canadian authorities, defendant voluntarily agreed to return to the United States.

Vogel's defense at his trial on the aforesaid indictments, and his principal contention in this appeal was that he was *legally insane* at the time of the commission of the crimes, and, therefore, could not be convicted of any crime.

The M'Naghten Rule has been the long and well-settled test of legal insanity in Pennsylvania* and has been approved and restated in more than a score of cases, commencing in early times** and reiterated in the recent cases of *Commonwealth v. Neill,* 362 Pa. 507, 67 A. 2d 276; *Commonwealth v. Heller,* 369 Pa. 457, 461, 87 A. 2d 287; *Commonwealth v. Patskin,* 375 Pa. 368, 371, 100 A. 2d 472; *Commonwealth v. Novak,* 395 Pa. 199, 211, 150 A. 2d 102; *Commonwealth v. Woodhouse,* 401 Pa. 242, 250, 164 A. 2d 98; and *Commonwealth v. Ahearn,* 421 Pa. 311, 321, 218 A. 2d 561. *Legal insanity* has been defined in all of these cases (with some minutiae of difference in the express language used) as *"inability from disease of the mind to understand the nature and consequences of his act or to distinguish between right and wrong with respect to it."*

Defendant introduced substantial evidence to prove his insanity. The first witness called by the defense was Officer Ray Merritts, one of the police officers who brought the defendant back to Lock Haven on the day following the commission of the crimes. Officer Merritts was asked what Vogel's general attitude was at the time Merritts was bringing him back to Lock Haven. To this question, Officer Merritts replied:

---

\* The M'Naghten Rule has been criticized widely and frequently, but Courts and scholars have been unable to agree upon a better and realistically wiser rule. See particularly the able analysis and discussion of this Rule and of psychiatric tests in *Commonwealth v. Woodhouse,* 401 Pa., supra.

\** Many Courts have considered that it was first established in Pennsylvania in *Commonwealth v. Mosler,* 4 Pa. 264.

"A. . . . At different times we talked to him and it just seemed that he was far removed from the area in which we were trying to talk to him about, which, naturally, would have been the shooting affair.   Q. Would you say, during this period of time, Dennis [Vogel] ever associated himself with the crime?   A. Not coming down from New York.   He was very quiet. . . . Q. Did he or did he not ever show any remorse?   A. No, he never showed any remorse."   Officer Merritts' testimony, namely, that the defendant's attitude was that of indifference without any remorse or fear of punishment, was substantiated by other members of law-enforcement agencies who had contact with the defendant in the days immediately following the commission of the crimes.

The defense then proceeded to call various members of defendant's family, who testified as to the erratic and often bizarre conduct of the defendant since his childhood.*

---

* For example, (1) while in his early teens standing on a small hill near his parents' home, he had thrown rocks at the front door for several hours, not allowing anyone to enter or leave the premises; (2) he was expelled from school because of his continued disruption of the classroom; (3) he screamed and yelled, in response to his father's offer to take him hunting, "You keep away from me," or "you are liable to find a stray bullet, too, up in the woods"; (4) he constantly kept the door of his bedroom locked and would stare at the floor for hours at a time; (5) after accompanying his father to Mass, he began to yell profane words at Mass, for no explained reason; (6) he woke his wife in the middle of the night and asked her to make cereal for him and, after she complied with his request and he had eaten the cereal, he beat her because he said the cereal made him sick— then he professed undying love for her; (7) he asked his wife to make hot tea for him and, after waiting for the tea to get cold before drinking it, beat her for making him cold tea; (8) he played war games with M & M candies—on one occasion his wife "reached down and grabbed . . . and popped an M & M in [her] mouth . . . [he] got furious at [her] because it 'was not dead' yet"; and (9) he had

The defense concluded their case by presenting testimony from four well-qualified psychiatrists. Three of the psychiatrists were employees of State hospitals, while the other was retained by the defendant upon the Court's authorization. All of these psychiatrists testified that the defendant was suffering from schizophrenia and, in their respective opinions, was legally insane at the time of the commission of the crimes.

No psychiatric testimony and *no direct affirmative testimony as to the defendant's mental condition, i.e., his legal sanity,* was offered by the Commonwealth. However, testimony had been given (a) during the Commonwealth's case in chief and (b) in defendant's case, from which the jury could justifiably infer and find beyond a reasonable doubt that defendant knew what he was doing when he robbed and killed his victims, and knew the difference between right and wrong with respect to his actions. Such testimony consisted, inter alia, of the *defendant's having made prior threats to kill the deceased Atwood;* his having debts and financial problems, thus showing a possible motive; his "casing" the Grant Store from across the street on the day before the killing, and his "casing" the store shortly before the robbery; his commission of the robbery and the murders after twelve o'clock noon, at a time when the store was closed to the public; his ransacking the safe and taking over $800 in cash and Mrs. Rechel's pocketbook and other items from the store after he shot and killed Atwood and Mrs. Rechel; his throwing away, after the murders, a .22-caliber revolver which he had purchased sometime before these murders; his fleeing with his wife and child to Canada, within an hour after the murders; his *warning his wife*

---

various other flights into imaginary worlds. This kind of testimony is often produced by the family of an accused, in order to try to save their loved one.

*not to look into the trunk of his car where he had hidden most of the stolen items;* and, as the police were coming into the restaurant in Canada where he and his wife had gone to eat, *his attempt to pass a large roll of bills to his wife and, when she refused to take it, his attempt to place it in her blouse.*

The most important question raised by defendant is this: Can a conviction be sustained when defendant produces direct affirmative evidence of his legal insanity and the Commonwealth offers no psychiatric *or medical or direct affirmative lay testimony of the defendant's sanity?*\*

In *Commonwealth v. Carluccetti*, 369 Pa. 190, 85 A. 2d 391, the Court said (page 199): "As sanity is the legally recognized normal condition of human beings, its existence in any given instance is presumed. Consequently, the burden of proving insanity as a defense to a criminal charge is upon the one asserting it. It is incumbent upon him to establish the alleged defective mental condition by a fair preponderance of the evidence: Commonwealth v. Iacobino, 319 Pa. 65, 68, 178 A. 823. *Throughout, the issue remains one of fact for the jury to determine.*\*\* As recognized by this court in Commonwealth v. Iacobino, supra,—'The presumption of sanity, which is the normal condition of

---

\* With respect to defendant's contention, some of our sister States, which also require a defendant to prove his insanity by a fair preponderance of the evidence, have reached diametrically opposite conclusions when confronted with this exact problem. *Compare In Re Dennis*, 51 Cal. 2d 666, 335 P. 2d 657, *with State v. King*, 375 S.W. 2d 34 (Mo.). *See also*, Insanity—Proof, 17 A.L.R. 3d 146, 217-219. The Federal Courts have adopted the principle, *in cases involving violations of Federal statutes*, that sanity is an essential ingredient of criminal liability, which, when questioned, *must be proved by the State*, as any other element of the offense, beyond a reasonable doubt. *Lynch v. Overholser*, 369 U.S. 705, 713. *Pennsylvania has always had a different rule.*

\*\* Italics throughout ours, unless otherwise noted.

man, "holds good, *and is the full equivalent of express proof* until it is successfully rebutted [citing cases]" ' ; or, as otherwise stated in the Iacobino case (p. 69),— 'Where mental capacity at the time of the act is an issue, the Commonwealth is aided by the presumption of sanity, *it is not required to prove affirmatively mental capacity to commit the act.'* "

We have previously been faced with a factual situation one step removed from the present one. In *Commonwealth v. Updegrove*, 413 Pa. 599, 198 A. 2d 534, we affirmed a conviction of murder in the first degree and held that the fact that the Commonwealth offered no expert, but only lay testimony to rebut defendant's expert and lay witnesses *did not preclude a conviction of murder.* The Court said (pages 601, 602-603) : "Two medical doctors, who specialize in the field of psychiatry, stated that in their opinion the defendant was legally insane at the time of the shooting, did not know the nature or quality of her act, and did not realize she was doing wrong. . . .

"The Commonwealth offered no medical testimony in refutation of that submitted by the defense. Counsel for the appellant, stressing the above fact and noting that post trial, the court had found on the basis of a report submitted by a psychiatrist that the defendant was mentally ill and required hospitalization, strenuously argues that the totality of the evidence manifests that the verdict of the jury was arbitrary and contrary to the weight of the testimony, requiring the grant of a new trial.

". . . While the Commonwealth did not offer medical opinion testimony as to the defendant's mental condition at the relevant time, it did submit substantial evidence through multiple witnesses *strongly indicating* that before the shooting and immediately thereafter, the defendant was in control of her senses and fully conscious of her acts. Further, her own spon-

taneous statements immediately following the occurence manifest an individual consciously remorseful of what she had done. Quite significantly, when questioned shortly after the shooting by an investigating police officer, she stated that the gun discharged accidentally while she and her husband were struggling for possession of it. When pressed for further details she declined to answer additional questions before talking to her lawyer. *In view of the whole record, the issue of the defendant's mental competency at the time of the homicide was properly for the jury's determination.*

"Since the sanity of an individual is always presumed, one who asserts insanity in defense of the commission of a crime has the burden of proving its existence by a fair preponderance of the evidence. Commonwealth v. Carluccetti, 369 Pa. 190, 85 A. 2d 391 (1952). As stated in Commonwealth v. Iacobino, 319 Pa. 65, 178 A. 823 (1935) at 68, 'The presumption of sanity, which is the normal condition of man, "holds good, and *is the full equivalent of express proof until it is successfully rebutted*" ': (Citing cases) ; and again, at 69, 'Where mental capacity at the time of the act is an issue, the Commonwealth is aided by the presumption of sanity, *it is not required to prove affirmatively mental capacity to commit the act.*' "

The function and dimension of the presumption of sanity is to prescribe a principle or rule of law that every person, including every person accused of a crime, is sane, in the absence of adequate evidence to prove the contrary. When sufficient or adequate evidence is presented to prove legal insanity, the presumption of sanity *disappears as a rule of law and the question of sanity or insanity becomes one for the trier of the facts.* Cf. *Commonwealth v. Updegrove,* 413 Pa., supra; *Commonwealth v. Woodhouse,* 401 Pa., supra. This is the important and controlling fact which the Majority blindly ignore or overlook.

Defendant presented, as we have seen, substantial testimony which, if believed, was adequate to prove that he was legally insane at the time of the commission of the aforesaid murders and robberies. No single fact or set of facts can, *as a matter of law,* be conclusive proof of insanity, and *therefore all the evidence, including the credibility of the witnesses, is for the jury* (or the trial Judge if sitting without a jury). *Commonwealth v. Lance,* 381 Pa. 293, 113 A. 2d 290; *Commonwealth v. Carluccetti,* 369 Pa., supra; cf. also, *Commonwealth v. Carroll,* 412 Pa. 525, 194 A. 2d 911; and *Commonwealth v. Updegrove,* 413 Pa., supra.

In *Commonwealth v. Kirkland,* 413 Pa. 48, 195 A. 2d 338, the Court said (page 58) : ". . . [I]t is well settled that a jury or a trial Court can believe all or a part of or none of a defendant's statements, confessions or testimony, or the testimony of any witness: Commonwealth v. Melton, 406 Pa. 343, 178 A. 2d 728; Commonwealth v. Tyrrell, 405 Pa. 210, 174 A. 2d 852; Commonwealth v. Ballem, 386 Pa. 20, 123 A. 2d 728; Commonwealth v. Donough, 377 Pa. 46, 50, 103 A. 2d 694; Commonwealth v. Homeyer, 373 Pa. 150, 153, 94 A. 2d 743; Commonwealth v. Phillips, 372 Pa. 223, 93 A. 2d 455." Accord: *Commonwealth v. Carroll,* 412 Pa., supra; *Commonwealth v. Winebrenner,* 439 Pa. 73, 265 A. 2d 108 (1970).

No test, formula or standard exists by which an appellate Court, as distinguished from the jury (or the trier of facts), can overrule a jury (or the trier of facts) and decide that the accused defendant is or is not legally insane. Since the Commonwealth did not introduce any direct affirmative testimony as to defendant's legal sanity, but relied upon (1) the legal presumption of sanity and (2) all inferences reasonably drawn from the facts and the evidence, had the jury believed defendant's witnesses, it certainly could and would have acquitted him by reason of insanity.

However, the jury, which saw and heard the witnesses, decided not to believe defendant's witnesses.\* *Since this was the jury's right, power and prerogative, its verdict must be sustained.*\*\*

A defendant is entitled to a new trial or to an arrest of judgment (as the case may be), no matter how justifiable the *verdict of guilty* appears from the evidence to have been, if, but only if, the trial Court committed a prejudicial error of law, or if the Commonwealth failed to prove defendant's guilt beyond a reasonable doubt. However, if the evidence, and all reasonable inferences therefrom, is sufficient to sustain a verdict of guilty beyond a reasonable doubt, a defendant is not entitled to a new trial if the trial Court or an appellate Court believes that the verdict was against the weight of the evidence. The *sufficiency* of the evidence is a matter for the Court, but the *weight of the evidence is a matter exclusively for the jury.* In other words, *if the appeal involves a question of fact or credibility, including the question of insanity, the issue is*

---

\* Section 410 of the Mental Health and Mental Retardation Act of 1966 provides: "Whenever any person is adjudged guilty of a crime punishable by sentence to a penal or correctional institution, the trial court may defer sentence and order an examination of the defendant for mental disability to guide it in determining his disposition. Such action may be taken on the court's initiative . . . ." Act of October 20, 1966, Spec. Sess. No. 3, P. L. 96, art. IV, §410. Therefore, had the trial Judge believed that the defendant was mentally disabled, as distinguished from legally insane, he surely would have utilized the aforesaid provision.

\*\* Defendant is not without an adequate remedy. His sentence can be commuted by the Board of Pardons, or it can pardon him. Moreover, if he is really mentally disabled, the warden or other officer in charge of the detaining penal or correctional institution, or counsel for the defendant, may petition the Court which imposed sentence for commitment of a mentally disabled person to a facility, as set forth in the Mental Health and Mental Retardation Act of 1966. Act of October 20, 1966, P. L. 96, art. IV, §411.

*exclusively a matter for the jury, and the Court cannot substitute its judgment for that of the jury.* Commonwealth v. Wendt, 258 Pa. 325, 102 Atl. 27; Commonwealth v. Lance, 381 Pa., supra, page 297; Commonwealth v. Pasco, 332 Pa. 439, 444, 2 A. 2d 736. Cf. also, Commonwealth v. Updegrove, 413 Pa., supra, page 602; Commonwealth v. Woodhouse, 401 Pa., supra, pages 260-261; Commonwealth v. Carluccetti, 369 Pa., supra.

In *Commonwealth v. Wendt,* 258 Pa., supra, the Court said (page 328): "On the appeal our first duty is to determine whether the evidence reasonably admits of the conclusion that the killing was wilful, deliberate and premeditated. If it so appears, the responsibility of determining the guilt rested *exclusively* with the jury. 'We do not sit,' said the court in McCue v. Commonwealth, 78 Pa. 185, 189, 'as upon a motion for a new trial, to determine where the weight of evidence lies, but to determine whether the ingredients necessary to constitute murder of the first degree shall have been proved to exist. These being proved, the jury must determine the guilt or innocence of the prisoner.' "

In *Commonwealth v. Pasco,* 332 Pa., supra, the Court said (page 444): "In our opinion the testimony was sufficient to sustain the jury's verdict, and it is well settled that in such cases the judgment of this Court will not be substituted for that of the jury: Com. v. Wendt, 258 Pa. 325 . . . ."

In *Commonwealth v. Lance,* 381 Pa., supra, the Court said (page 297): "The jury chose to disbelieve the testimony of his expert witnesses, and the testimony being sufficient to sustain its verdict, this Court will not substitute its judgment for that of the jury: Commonwealth v. Pasco, 332 Pa. 439, 444, 2 A. 2d 736; Commonwealth v. Carluccetti, 369 Pa. 190, 206, 85 A. 2d 391."

## Second Offense

Appellant's second contention is that Section 701 of The Penal Code of June 24, 1939, P. L. 872, 18 P.S. §4701, as amended,* is not applicable to a defendant charged with committing multiple murders at or about the same time. I agree. Section 701 provides: "Whoever is convicted of the crime of murder of the second degree is guilty of a felony, and shall, *for the first offense,* be sentenced to undergo imprisonment by separate or solitary confinement not exceeding twenty (20) years, or fined not exceeding ten thousand dollars, or both, *and for the second offense,* shall undergo imprisonment for the period of his natural life."

In my opinion, the term "second offense" means a subsequent murder which was committed after a conviction of a prior murder. Cf. *Commonwealth ex rel. Swingle v. Banmiller,* 398 Pa. 43, 156 A. 2d 520; *Commonwealth v. Swingle,* 403 Pa. 293, 169 A. 2d 871. Therefore, in order to increase the punishment for a *second offense* of murder (of the second degree), a prior conviction must precede the commission of the second murder.

For the reasons hereinabove set forth, I very vigorously dissent from the Court's Opinion and its vacation of the judgment of sentence and the grant of a new trial on both counts of the murder indictment. I would affirm the judgment of sentence imposed upon defendant for the murder of Donald Atwood and for armed robbery, namely, imprisonment for the term of not less than ten nor more than twenty years for each of the aforesaid criminal acts. I would vacate the judgment of sentence imposed upon defendant for the (second) murder of Shirley Rechel, namely, life imprisonment,

---

* Amended by the Act of December 1, 1959, P. L. 1621, §1, 18 P.S. §4701.

34

and I would remand the case to the Court below for imposition of a proper and legal sentence on the second count in the murder indictment.

Mr. Justice EAGEN joins in this dissenting opinion.