**UNITED STATES of America ex rel.
Ray V. JOHNSON, H–5984**

v.

**Joseph R. BRIERLEY, Superintendent.**

**Civ. A. No. 71–501.**

United States District Court,
E. D. Pennsylvania.

Sept. 24, 1971.

Ray V. Johnson, in pro. per.

Mark Sendrow, Asst. Dist. Atty., for respondent.

## MEMORANDUM AND ORDER

DITTER, District Judge.

Petitioner was convicted of voluntary manslaughter in a state trial by a judge without a jury and sentenced to serve from four to 12 years in a correctional institution. Thereafter, he petitioned under Pennsylvania's Post Conviction Hearing Act for leave to file motions for a new trial or in arrest of judgment nunc pro tunc. Leave was granted, but after argument, the motions were refused by the trial court. This decision was affirmed by the Supreme Court of Pennsylvania. Having exhausted his state remedies, petitioner then obtained a writ of habeas corpus in this court. He raises two questions: first, was he mentally competent at the time of trial, and second, was he denied the effective assistance of counsel?

■■■ The test for mental competency to stand trial is whether the defendant understands the proceedings against him and is able to assist in his own defense: Commonwealth v. Novak, 395 Pa. 199, 205, 150 A.2d 102 (1959); Dusky v. United States, 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960). Competency is presumed and the burden is on the petitioner to establish his incompetency.

■ Petitioner's only evidence in this regard was his own testimony. In summary he said that he had attended a school for retarded children, had been tested for "mental problems" by a Philadelphia children's hospital, was barely able to read, and unable to do much writing. He stated that he understood that he had a low IQ. In addition, he testified that at the time of trial he did not comprehend the serious nature of the charges against him, and did not realize that homicide was more serious than stealing.[1] He also said that he did not think he was able to communicate with his lawyers during the trial, although he imagined that he did his best to answer their questions. Consistent with his testimony at trial, he also maintained that he could not remember the events of the crime he was charged with committing. He said that he did not understand what was going on in the court room. However, petitioner's low intelligence level does not establish incompetency: Commonwealth v. Savage, 433 Pa. 96, 99, 249 A.2d 304 (1969); Commonwealth v. Melton, 406 Pa. 343, 349, 178 A.2d 728 (1962); and United States ex rel. Melton v. Hendrick, 218 F.Supp. 293, 296–297 (E.D. Pa.1963), aff'd 330 F.2d 263 (3rd Cir. 1964); neither does his inability to remember the details of the crime. The latter is a frequent defense: Commonwealth v. Rightnour, 435 Pa. 104, 108, 253 A.2d 644 (1969); Commonwealth v. Reid, 432 Pa. 319, 247 A.2d 783 (1968); Commonwealth ex rel. Cummins v. Price, 421 Pa. 396, 401, 218 A.2d 758 (1966); Commonwealth v. Lance, 381 Pa. 293, 295, 113 A.2d 290 (1955); and Commonwealth v. Heller, 369 Pa. 457, 460, 87 A. 2d 287 (1952).

At the time of trial, petitioner was represented by Joseph L. Ehrenreich, Esquire, and John Y. Mace, Esquire. Mr. Ehrenreich testified at the hearing I conducted in this matter. He stated he had been admitted to the bar in 1916 and between 1957 and 1966, the time of petitioner's trial, had handled 20 to 25 homicide cases, some of which were charges of first degree murder.

The homicide in question took place on Christmas Day, 1964. Mr. Ehrenreich was appointed to represent petitioner on February 8, 1965, interviewing petitioner for the first time on March 25, 1965. He saw petitioner five additional times in 1965 and represented petitioner in January, 1966, on a motion to suppress a confession.[2] Mr. Ehrenreich saw petitioner six other times in 1966 prior to November 15, 1966, the day that trial began. In preparation for trial,

---

1. He knew, however, it would be wrong to testify falsely while under oath (N.T. 32).

2. The motion to suppress was granted.

Mr. Ehrenreich obtained the records from the Philadelphia Board of Education and from the St. Christopher's Childrens' Hospital. He also had a psychiatric examination made.[3]

At the evidentiary hearing in this court, Mr. Ehrenreich testified that during his interviews and discussions, there was no difficulty in communicating with petitioner. He said that petitioner seemed to understand what was going on although he did have an indifferent attitude. Mr. Ehrenreich stated that he had talked over the nature of the charges and the various types of homicide with the petitioner, reviewed his confession and obtained information from him, and discussed trial strategy. Mr. Ehrenreich also said that during the trial he had no trouble in conversing with petitioner. He asked him questions and understood the replies. (N.T. 44) According to Mr. Ehrenreich, he had no reason to believe that petitioner was incompetent to stand trial. (N.T. 39)

In addition, petitioner testified on January 5, 1966, in support of the motion to suppress the confession which Mr. Ehrenreich had filed. Petitioner's testimony covers almost twelve pages. There is nothing which indicates any inability to understand the questions posed to him. He testified concerning his interrogation, the absence of *Miranda* warnings and some of the events that preceded the crime.

The only possible question about petitioner's competency arises from a remark made by the trial judge just before sentence was imposed. At that time he commented that he felt the petitioner had been under mild sedation during the course of the trial. However, this was not the case. (N.T. 15–16, 57–58) Secondly, the trial judge commented to Mr. Ehrenreich, "You have been

greatly handicapped because of the lack of communication here," to which Mr. Ehrenreich replied, "That's putting it mildly, sir." (N.T. 58) At the hearing before me, Mr. Ehrenreich explained that petitioner's attitude made it difficult to obtain information from him. Moreover, in view of the pretrial interviews with petitioner, Mr. Ehrenreich was surprised by his testimony that he was unable to remember various events pertaining to the homicide.

Mr. Ehrenreich was experienced and able trial counsel. He met frequently with the petitioner, had an opportunity to observe him closely, both before and during trial, and understood fully the duty that was his as counsel. While I do not feel that petitioner's testimony in and of itself was sufficient to establish any incompetency, it was completely rebutted by that of Mr. Ehrenreich. I conclude and find as a fact that petitioner was competent to stand trial.

Petitioner's claim that counsel was ineffective is based on three matters. First, no motion to suppress certain bloodstained clothes petitioner wore at the time of his arrest was filed; second, a competency hearing for petitioner was not requested; and third, the Commonwealth's failure to produce medical corroboration of testimony given by the decedent's common law wife was not challenged.

These matters are easily answered. The bloodstained clothes were not introduced into evidence. As far as any competency proceedings were concerned, as previously noted, Mr. Ehrenreich thought there was no competency question. He had gone over petitioner's educational background, interviewed him extensively, received the reports of a recent mental examination, and had concluded petitioner was competent to stand trial. Petitioner had never suggested

3. The examination revealed no evidence of mental disease and that petitioner was at least within the low average of general intelligence with reasoning ability and judgment intact. He was said to be aware of social standards and capable of rationally evaluating his behavior accordingly. The report concluded that he was mentally competent to confer with counsel.

anything to the contrary.[4] Accordingly, there was no basis on which to ask for a competency hearing.

Petitioner's third allegation concerns the testimony of Lillian Jones. She stated that she was the common law wife of Charles Dandridge. On December 25, 1964, petitioner and Dandridge were drinking in the apartment she shared with Dandridge. She went to bed but awoke to find petitioner was having intercourse with her. She screamed, Dandridge came into the room and in an ensuing fight, Dandridge was killed.

■ Petitioner contends that counsel was ineffective because there was no demand for medical corroboration of her testimony. However, there was nothing to indicate that Miss Jones was ever examined by a doctor, what such an examination would have established, or how it would have been legally relevant. Petitioner was not charged with rape, or with murder committed during the course of a felony. Miss Jones' testimony in this regard was merely background. Whether petitioner was having intercourse with her or not was not the question before the Court. The only question was whether petitioner killed Dandridge and if so, the degree of the offense.

Petitioner's contentions that his attorneys were ineffective are completely without support. Quite to the contrary, the record indicates that they discharged their duty to him with the highest fidelity.

Having concluded that there is no foundation for either of petitioner's claims, his writ of habeas corpus must be refused.

4. (N.T. 8, Post Conviction Hearing before the Honorable Raymond Pace Alexander, Court of Common Pleas, Philadelphia, May 1, 1969).